UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| SONNY DAVIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:19-cv-00091-JRS-MJD |
| ) | |
| AASHIA BADE, et al., ) | |
| ) | |
| Defendants. ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Sonny Davis brought this action alleging that the defendants were deliberately indifferent to his serious medical needs. The defendants have moved for summary judgment. For the reasons explained below, the Court finds that Mr. Davis has not presented a genuine issue of material fact, and the defendants' motion for summary judgment, dkt. [41], is **GRANTED**.

**I.
SUMMARY JUDGMENT STANDARD**

A motion for summary judgment asks the Court to find that the movant is entitled to judgment as a matter of law because there is no genuine dispute as to any material fact. *See* Fed. R. Civ. P. 56(a). A party must support any asserted disputed or undisputed fact by citing to specific portions of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party may also support a fact by showing that the materials cited by an adverse party do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly

support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the only disputed facts that matter are material ones—those that might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609−10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Trustees of Indiana University*, 870 F.3d 562, 573−74 (7th Cir. 2017) (quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(3). The non-moving party bears the burden of specifically identifying the relevant evidence of record. *D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015). This is in part because summary judgment is the "put up or shut up" moment in a lawsuit. *Grant*, 870 F.3d at 568.

## II.
## FACTUAL BACKGROUND

### A. The Parties

Plaintiff Sonny Davis has been an inmate of IDOC since 2003. Dkt. 50-1, p 12-13. He was transferred from Westville Correctional Facility to WVCF on or about July 31, 2018. Dkt. 43-1, para. 7.

Defendant Aashia Bade, Psy.D., is a psychologist employed by Wexford of Indiana, LLC ("Wexford"). Dkt. 43-1, paras. 1-2. She served as Wexford's regional director of mental health from July 9, 2017, to October 27, 2018. *Id.* at para. 2. She is currently the associate director for mental health programs for Wexford Health Sources, Inc. *Id.*

Defendant Sarah Clarke is employed as a licensed mental health professional by Wexford. Dkt. 43-2, para. 2. She has worked at WVCF since approximately February 2018. *Id.* Ms. Clarke has the authority to see and provide clinical mental health services to inmates, but she does not have the authority to order medications, unilaterally order a change in housing assignment, or declare an inmate seriously mentally ill. *Id.* at 6. She may consult with a licensed psychologist, such as Dr. Sims or Dr. Bade, if she believes that a patient requires a new diagnosis. *Id.* Defendant Kelly Inda is employed as a licensed mental health professional by Wexford. Dkt. 43-3, para. 2. She has worked at WVCF since April 1, 2017. *Id.* Ms. Inda has the authority to see and provide clinical mental health services to inmates, but she does not have the authority to order medications, unilaterally order a change in housing assignment, or declare an inmate seriously mentally ill. *Id.* at 9. She may consult with a licensed psychologist, such as Dr. Sims or Dr. Bade, if she believes that a patient requires a new diagnosis. *Id.*

### B. Mr. Davis' History of Mental Illness

Mr. Davis has suffered from mental illness issues his entire life. Dkt. 50-1, p. 1. He has spent time in treatment facilities and has been prescribed medication to treat these mental health issues. *Id.* Mr. Davis reports suffering from "depression (constant thoughts of suicide), anxiety (panic attacks that feel as if I am having a heart attack which leaves me in pain all over my body and feels as if I'm dying)," and auditory hallucinations. *Id.* "When I'm hearing voices or having

panic attacks I cut on my arms to stop the panic attacks or to quiet the voices. Something about inflicting injuries to myself brings me to reality or out of the state I'm in." *Id.*

Mr. Davis' history of mental illness during his incarceration at IDOC is well documented. On February 28, 2003, the sentencing court issued an Abstract of Judgment that found, as a mitigating factor, Mr. Davis' mental illness and depression. *Id.* at 13.

On May 5, 2014, an IDOC official provided the following review summarizing Mr. Davis' mental health issues:

> The offender Davis has a "C" mental health code which means he has a psychiatric disorder that causes little functional impairment and requires infrequent psychiatric services. These services may be routine and/or unplanned in nature and may involve mental health monitoring. Offender Davis was transferred to Pendleton Correctional Facility (IRT) on 3/18/2014 and has been participating in therapy since that time. It is recommended that offender Davis continues to actively participate in therapy and continue to take his prescribed medications.

*Id.* at 44.

On September 21, 2016, Dr. Eddie Taylor noted that Mr. Davis has diagnoses of Axis I Major Depression and Axis II antisocial personality disorder. *Id.* at 46. Dr. Taylor also noted that Mr. Davis experiences issues with anxiety. *Id.* At that time, Mr. Davis was prescribed Prozac for depression. Dr. Taylor determined that Mr. Davis "appears to be stable since being put back on medications." *Id.* at 47.

### C. Events at WVCF

On July 31, 2018, Mr. Davis was transferred from Westville Correctional Facility to WVCF. Dkt. 43-1, para. 7. At that time, Mr. Davis had a mental health classification of A, indicating that he was free of mental health issues. *Id.* at para. 5. Prior to this transfer, Mr. Davis was housed in the Westville Control Unit, which is a restrictive housing unit. *Id.* at 7.

4

On August 1, 2018, Mr. Davis was placed on suicide precautions and was evaluated by Ms. Clarke. Dkt. 43-2, para. 7; Dkt. 43-3, para. 5. Ms. Clarke reviewed records indicating that Mr. Davis had a history of improper behavior as well as expressing the potential for self-harm. *Id.* Ms. Clarke claims that Mr. Davis did not cooperate or communicate with her during their session and noted that he was irritable, hostile, and short. *Id.* She did not believe that he had a significant risk of self-harm and indicated that he could receive normal bedding items, clothing items, and finger foods for meals. *Id.* She also kept him on a close observation status. *Id.*

On August 2, 2018, Ms. Clarke followed up with Mr. Davis. *Id.* at para. 9. Ms. Clark claims that Mr. Davis told her he never felt suicidal and was mad about being transferred. *Id.* He apologized for being disrespectful, and Ms. Clarke removed him from suicide watch. *Id.*

On August 3, 2018, Mr. Davis was evaluated by Ms. Inda. *Id.* He told Ms. Inda that he had been stressed and was struggling with impulses of self-harm and feelings of depression. *Id.* Ms. Inda suggested that they work on coping skills to avoid acting out engaging in self-harm. *Id.* Mr. Davis was placed on a temporary mental health hold pending his long-term housing assignment. *Id.*

On August 6, 2018, Ms. Clarke went to see Mr. Davis, but he refused her visit. *Id.* at para. 10. Mr. Davis was blocking his cell camera and, after refusing to move, was pepper sprayed by custody staff. *Id.* When Ms. Clarke saw Mr. Davis the next day, he was courteous and polite but indicated that he was on a hunger strike. *Id.* at para. 11. Ms. Clarke claims that he did not appear to be having any mental health issues at that time, and he was given a temporary mental health placement pending his transfer to a permanent housing unit. *Id.*

On August 12, 2018, Mr. Davis completed the following Request for Health Care Form:

I am requesting to see the psychologist. Will you please forward this to Dr. Sims. Ms. Sims I don't know if you remember me from last time I was here. I am not

5

> doing very good. I am hearing voices and am having crazy thoughts of hurting myself. I really need to be placed back on my medication. I need to be seen A.S.A.P.

*Id.* at 52. This form was reviewed by Ms. Clarke on August 18, 2018. *Id.*

On August 21, 2018, Dr. Sims met with Mr. Davis for an evaluation. Dr. Sims diagnosed Mr. Davis with Axis II borderline personality disorder. *Id.* at 7, 8. Her report noted that Mr. Davis has a history of cutting himself when he becomes distressed and has a history of self-harm in segregation. *Id.* at 7, 8, 9. In her report, Dr. Sims indicated that she had diagnosed Mr. Davis with Axis II borderline personality disorder, that she would recommend removing Mr. Davis from the Restrictive Housing Unit, and that she would refer him to a psychiatrist. *Id.* at 8, 9.

On August 21, 2018, Dr. Sims sent the following email to several IDOC officials and mental health staff:

> I saw Sonny Davis 12888 in SCU and he was given Axis II diagnosis that would contraindicate SCU and there is most likely going to be Axis I diagnosis and there is current need for evaluation for medication. Therefore there is now a contraindication for continued placement in WVCF Restricted Housing Unit/SCU.

Dkt. 1-1, p. 2. The defendants were recipients on this email and on the following emails from IDOC officials. *Id.* at 2, 4, 6.

IDOC official James Basinger wrote back to Dr. Sims, telling her not to "remove [Mr. Davis] from SCU until Mark Levenhagen and I have discussed." *Id.* at 4. Dr. Sims then asked, "Should I hold back on the MSC Code change to 'C'? He actually would do better staying in SCU if we could treat him there." *Id.* Mr. Levenhagen then sent the following response:

> All, this offender **is not** to be moved from the SCU. We are in the process of making him a "danger" exception in compliance with the IPAS agreement.[1] I talked with Dr. Dwenger regarding his mental health needs and if necessary, we will figure out a way to treat him in the SCU. Moving him anywhere else at this time would fail to meet his security needs.

---

[1] On January 27, 2016, IDOC officials entered into a class action settlement agreement restricting IDOC's ability to place inmates with a serious mental illness in long-term segregation. Dkt. 50-1, pp. 15-41; *see also Indiana Protection and Advocacy Servs. Comm'n v. Commissioner*, No. 1:08-cv-1317-TWP-MJD at dkt. 496.

*Id.* at 11 (emphasis in original).

After Dr. Dwenger indicated that she was not available, Dr. Bade offered to review Mr. Davis' chart and re-evaluate Dr. Sims' diagnosis. *Id.* at 6. Dr. Bade sent an email, less than two hours after receiving the email from Mr. Levenhagen, indicating that she had "briefly" reviewed Mr. Davis' chart and believed that his behaviors were related "primarily to his previous diagnosis of Antisocial Personality disorder." *Id.* at 9. She asked that Dr. Sims' diagnosis of borderline personality disorder and the change in Mr. Davis' mental health classification "be deferred in the EMR, until an in person evaluation can be conducted by Dr. Dwenger or myself." *Id.*

On August 28, 2018, Dr. Bade met with Mr. Davis for an in-person evaluation. Dkt. 43-1, para. 13. In an email to mental health staff and IDOC officials, Dr. Bade indicated that "Mr. Davis did report symptoms that may be consistent with trauma related anxiety; however, it is unclear if these reported symptoms are (1) genuine or feigned, (2) goal oriented or spontaneous, and/or (3) acute or chronic." Dkt. 1-1, p. 8. "I'm recommending that no MH diagnosis be made at this time, MH code remains 'A' and MH staff will monitor per their SCU protocol." *Id.*

On September 6, 2018, Mr. Davis directed a Request for Health Care form to Ms. Clarke, indicating that he was "not getting any better and need[ed] a resolution. I need to know what I need to do as I am in serious need of help and am suffering everyday." Dkt. 50-1, p. 51. Ms. Clarke reviewed this form and indicated that Mr. Davis was seen on September 10, 2018. *Id.*

On September 10, 2018, Ms. Clarke met with Mr. Davis and suggested that he work on his coping and communication skills. Dkt. 43-2, para. 15. Mr. Davis told Ms. Clarke that he needed to be placed back on his medication. *Id.*

On September 12, 2018, Mr. Davis submitted a grievance indicating that he was hearing voices "that tell me to hurt myself and others. Medication prevents me from hearing these voices." Dkt. 1-1, p. 25.

On October 10, 2018, Dr. Bade sent an email to WVCF Warden Richard Brown asking, "Is mr sonny (sic) Davis doing ok?" Dkt. 1-1. Warden Brown replied, "We haven't heard anything from him lately. I will copy other staff on this in case they have heard anything." *Id.* at 19. The next day, IDOC official Jerry Snyder responded, "I have heard nothing from custody staff of any issues and his caseworker states he is doing fine." *Id.* In reply, Dr. Bade wrote, "Thanks!! I checked in with MH staff, they reported no concerns currently. Just wanted to make sure things have been ok since it's been a month and a half." IDOC official Frankie Littlejohn responded to Dr. Bade's email, indicating that he had "pulled [Mr. Davis] out last week at his request to speak with me." *Id.* According to Mr. Littlejohn, Mr. Davis broke down in tears about his placement in the Restrictive Housing Unit believing that there was nothing he could do to change his placement. *Id.* Mr. Littlejohn "reinforced that him playing the MH card to manipulate his placement would not accomplish his goals of improving his circumstances." *Id.*

Ms. Clarke and Ms. Inda claim that Mr. Davis refused to meet with them on October 8, 2018, and December 11, 2018, respectively. Dkt. 43-2, para. 16; dkt. 43-3, para. 10. However, Mr. Davis claims that they ignored his reports of serious mental health symptoms and that he "was denied to be called out for session by both" Ms. Clarke and Ms. Inda. Dkt. 50-1, p. 4.

### III.
### DISCUSSION

#### A. Deliberate Indifference Standard

Mr. Davis asserts Eighth Amendment medical care claims against the defendants. At all times relevant to his claims, he was a convicted offender. Accordingly, his treatment and the

8

conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotations omitted). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Plummer v. Wexford Health Sources, Inc.*, 609 F. App'x 861, 862 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In

addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (internal quotation omitted). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

### B. Mr. Davis' Claims Against the Defendants

#### 1. Dr. Bade

Mr. Davis has failed to present evidence against Dr. Bade on the subjective element of his deliberate indifference claim. Before making a diagnosis, Dr. Bade reviewed Mr. Davis' medical records and met with him for an in-person evaluation. Although her diagnosis differed from that of Dr. Sims, and although it came after Mr. Levenhagen's e-mail stating that Mr. Davis was not to be moved at the time due to his security needs, these facts alone are insufficient to establish an Eighth Amendment violation. In the months after making this diagnosis, Dr. Bade inquired about Mr. Davis' mental health status with IDOC staff. Although Mr. Davis reported that he continued to have panic attacks, auditory hallucinations, and episodes of self-harm, this information was kept from Dr. Bade when IDOC officials told her that "his caseworker states he is doing fine." Dkt. 1-1, p. 19. Thus, despite her affirmative efforts to follow up on Mr. Davis' status, Dr. Bade lacked a subjective awareness that Mr. Davis was still reporting symptoms.

Mr. Davis urges the Court to draw the inference that Dr. Bade did not make a medical judgment, and instead merely succumbed to Mr. Levenhagen's directive. Dkt. 50, p. 3. But, the undisputed facts that Dr. Bade conducted an independent review of the medical records, conducted an in-person examination of Mr. Davis, and made an unsolicited follow up into Mr. Davis' status

make this an unreasonable inference. Also, Dr. Bade's personal examination and assessment is in line with other undisputed evidence, such as Mr. Davis having a mental health classification of A (i.e., free of mental health issues) when he was transferred into WVCF, Ms. Clarke's multiple assessments that he did not pose a significant risk of self-harm and Mr. Davis' supporting pronouncement to her that he was not suicidal, and Ms. Inda's suggestion that they work on his coping skills. Similarly, Dr. Sims concurred that Mr. Davis could be better treated in administrative segregation. Indeed, there is no constitutional right to be treated outside of segregation, notwithstanding any terms of the settlement agreement. Also, there is no evidence that Dr. Bade could have overruled a security decision made by IDOC officials in any event, and, as a psychologist, she could not prescribe the medications upon which Mr. Davis' claims are premised. As for the latter, any failure to recommend medications does not evidence deliberate indifference. Similarly, her review of medical records, in-person evaluation, and proactive follow-up do not evidence deliberate indifference. Accordingly, the motion for summary judgment is **granted** in favor of Dr. Bade.

    2. <u>Ms. Clarke and Ms. Inda</u>

Mr. Davis has failed to present evidence against Ms. Clarke and Ms. Inda on the objective element of his deliberate indifference claim. Upon Mr. Davis' arrival at WVCF, Ms. Clarke reviewed his medical records, met with him multiple times, and recommended that he remain on close observation status. Not only did Ms. Clarke initially not believe that he had a significant risk of self-harm, he later confirmed to her that he did not feel suicidal, leading her to take him off the precautionary suicide watch. Days later, Ms. Clarke met with him again and noted that he did not appear to be having any mental health issues. Ms. Inda also met with Mr. Davis and discussed coping skills to alleviate his mental health episodes. Notably, because the foregoing occurred prior

11

to any directive from Mr. Levenhagen, the aforementioned unreasonable inference—that Ms. Clarke and Ms. Inda were not exercising their judgment and instead succumbing to Mr. Levenhagen's directive—does not even arise. After Mr. Davis was evaluated by Dr. Bade, Ms. Inda and Ms. Clarke continued to meet with him. Although Mr. Davis now claims that they refused to meet with him for counseling, IDOC records indicate that it was Mr. Davis who refused to meet with them. Even if this could be considered a dispute,[2] when this dispute is construed in Mr. Davis' favor he is still not entitled to relief. Mr. Davis' claims are based on the medical staff's refusal to prescribe mental health medication, which is something Ms. Clarke and Ms. Inda were not even authorized to do. Also, even if they could have recommended that medications be prescribed, there is no evidence that they felt this was necessary, or that the failure to make such recommendation would rise to deliberate indifference. To the contrary, Ms. Clarke did not note any mental health issues and Ms. Inda worked with Mr. Davis on coping skills rather than ignoring his alleged mental health issues. Accordingly, the motion for summary judgment is **granted** in favor of Ms. Clarke and Ms. Inda.

## IV.
## CONCLUSION AND FURTHER PROCEEDINGS

Mr. Davis' motion for an extension of time to file a response to motion for summary judgment, dkt. [48], is **granted**. The defendants' motion for summary judgment, dkt. [41], is **granted**. Mr. Davis' motion for sanctions, dkt. [52], is **denied**.

The **clerk is directed** to issue final judgment in accordance with this order.

**IT IS SO ORDERED**.

---

[2] For example, Mr. Davis could be referring to times when he sought an informal meeting, whereas Ms. Inda and Ms. Clarke could be referencing formally scheduled meetings documented in the records; they all could be correct.

Date: 9/30/2020

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

SONNY DAVIS
128888
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111
CARLISLE, IN 47838

David A. Arthur
INDIANA ATTORNEY GENERAL
David.Arthur@atg.in.gov

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Marley Genele Hancock
INDIANA ATTORNEY GENERAL
marley.hancock@atg.in.gov